UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re | ) Case No. 11-44932 |
| Michael C. McKean, | ) |
| Blanca L. McKean, | ) |
| Debtors, | ) Chapter 7 |
| | ) |
| Mitch House, | ) |
| Plaintiff, | ) Adv. Pro. No. 11-4254 |
| vs. | ) |
| Michael C. McKean, | ) |
| Blanca L. McKean, | ) |
| Defendants. | ) |

SUPPLEMENTAL MEMORANDUM RE: HOUSE V. MCKEAN

This Court conducted a trial in this matter on April 16, 2012. On April 20, 2012, this Court convened a telephonic hearing to allow the parties to make their "closing statements," at the conclusion of which the Court announced orally its findings and

conclusions and its rulings on the matters before it. Briefly summarized, the Court found and concluded that: (a) there was no basis to find Defendant Bianca McKean liable for a nondischargeable debt to Plaintiff on any theory advanced; (b) there was no basis to conclude that Defendant Michael McKean was a "fiduciary" to Plaintiff within the meaning of Section 523(a)(4) of the United States Bankruptcy Code (the "Code"), and that, therefore, none of the debts owed by Defendant Michael Mckean to Plaintiff were nondischargeable under that Section; (c) there was no basis to conclude that any debts owed by Michael McKean to Plaintiff resulted from "willful and malicious injury" by Michael McKean to the Plaintiff or his property, within the meaning of Section 523(a)(6) of the Code; (d) with the exception of two advances in the amounts of $14,000 and $10,900, none of the debts owing from Michael McKean to Plaintiff arose from false pretenses, a false representation or actual fraud, within the meaning of Section 523(a)(2)(A) of the Code; (e) there was no basis to award Plaintiff consequential or punitive damages, because, among other reasons, Plaintiff's Complaint did not request such damages; and (f) there was no basis to award Plaintiff attorneys' fees for bringing this action.

On May 15, 2012, this Court issued a Memorandum of Decision (the "Initial Memorandum") in which the Court (a) summarized its findings and conclusions and (b) directed the parties to file supplemental briefs concerning two issues: (a) their positions concerning the application of certain amounts repaid to Plaintiff

2

Case: 11-04254    Doc# 44    Filed: 07/30/12    Entered: 07/30/12 16:56:48    Page 2 of 16

by Defendants in April 2009 and May 2009, and (b) their positions concerning the total amount of the unpaid debt from Defendants to Plaintiff.

Plaintiff filed a "Plaintiff's Pleading Response to Memorandum Decision" on May 31, 2012 ("Plaintiff's Supp. Brief"). Defendant Michael McKean filed a "Defendant's Response to Memorandum of Decision" on June 5, 2012 ("Defendant's Supp. Brief"). Having reviewed the parties' supplemental briefs, the Court provides this Supplemental Memorandum to rule on the matters left unresolved in the Initial Memorandum, in light of the parties' assertions, and to address, for the benefit of any reviewing court, assertions of the parties concerning the Court's conduct of the trial in this matter.

1. **Application of Amounts Repaid to Plaintiff in April 2009 and May 2009 to Debts Outstanding.**

The Court's Initial Memorandum asked the parties to address the proper application of payments by Defendant Michael McKean to Plaintiff in the amount of $5,000 in April 2009 and $8,000 in May 2009 to the total amounts outstanding. In particular, because the Court was under the impression that the nondischargeable advances of $14,000 and $10,900 had been made in February and April 2009, and that the repayments occurred in April and May 2009, the Court wished to determine whether it would be necessary to apply the amount repaid to the last two nondischargeable advances, in light of any understanding or agreement of the parties.

Defendant's Supp. Brief pointed out that the $14,000 and $10,900 advances were made in February and April 2008, not 2009 as

the Court had mistakenly recalled. In light of that correction, Defendant further asserted that the Court should reconsider its determination that the $14,000 and the $10,900 advances were nondischargeable, pointing out that the Court had based this determination, at least in part, on the Court's assumption that, by 2009, when housing prices had begun to fall, it was no longer as likely that the Plaintiff could recoup any "losses" from Defendant simply by selling the Tunbridge Property and realizing substantial equity over the secured debt. While the Court acknowledges Defendant's argument, the Court will not change it's determination that the $14,000 and the $10,900 advances were nondischargeable.

The primary reason for finding those debts nondischargeable was that, in these instances, the Court found Plaintiff's version of the events leading up to these advances credible, i.e., that Defendant, who by that time had received numerous advances from Plaintiff which had not been repaid, told Plaintiff that if he made these advances, Defendant would promptly repay him from commissions he was about to receive, that that statement was false when made, that Defendant knew it to be false, that Plaintiff justifiably relied thereon and suffered harm. Although Defendant equivocated a bit about the statements he made, disputing whether he told Plaintiff that he would receive a sum certain in commissions ($60,000) or exactly when he would receive them, the Court did not find Defendant's equivocations material, or credible, especially in light of Defendant's later confirmation in writing of the gist of his prior statements. (Plaintiff's Exh. 14). Moreover, to the

4

extent that the Court had based its prior ruling on the proposition that Plaintiff might not have made himself whole by resort to the Tunbridge Property in mid-2009, the same proposition is equally plausible for the period of mid-2008. Thus, the Court declines to alter its ruling concerning the $14,000 advance and the $10,900 advance.

Having determined that the repayment actually occurred a year after the nondischargeable advances, the Court does not believe it necessary or appropriate to apply any special rules to the allocation of the repayment, and agrees with the position set forth in the Plaintiff's Supp. Brief that the Plaintiff may apply that repayment to any portion of the unpaid debt, and that it does not therefore reduce the balance of the nondischargeable debt.

To the extent that the Plaintiff's Supp. Brief also argues that the Plaintiff is entitled to impose an interest rate of twenty per cent (20%) on any unpaid debts from Defendant to Plaintiff, the Court determines that there is absolutely no basis, in any agreement between the parties or in any statute or law, to impose such a rate. In the absence of a rate set forth in an agreement of the parties, the Court will apply the California state statutory rate of ten percent (10%) per annum to the unpaid debts, as set forth in Cal. Civ. Code § 3289, to the entire debt, up to the date of filing of the petition. As explained in greater detail at the conclusion of this decision, although the discharged amount of the debt will not bear interest post-petition, the nondischargeable

portion of the debt will continue to accrue interest at ten percent (10%) until paid.

   2.   Disagreements Concerning Total Amount of the Debt.

The parties disagree about the total amount of the debt due and owing from Defendant Michael McKean to Plaintiff. Plaintiff asserts that the total unpaid as of May 2009 (the last time Defendant made a repayment to Plaintiff) is $263,997.87, excluding consequential damages and attorney's fees that the Court has ruled are not collectible. Defendant asserts that the total amount due and owing is $234,072.29.

With respect to the discrepancy of $29,925.58, the Court has determined that House's record keeping was meticulous, and therefore more reliable, and, for that reason, the Court will adopt House's figure as the appropriate amount of damages.

   3.   Additional Matters Raised By Plaintiff's Supp. Brief.

Plaintiff's Supp. Brief additionally raised a number of issues respecting the Court's conduct of the trial in this case, the alleged resulting prejudice to Plaintiff, and a number of other "issues" allegedly pertinent to this matter. For the benefit of the parties, and for the benefit of any court reviewing this Court's decision in this matter, the Court responds to Plaintiff's assertions as follows:

   A.   Debtors' "Illicit" Bankruptcy Case.

Plaintiff asserts that the Defendants filed an "illicit" bankruptcy case, based upon (a) Defendants' alleged failure of the "means test" of Section 707(b) of the Code, and (b) Defendants'
6

filing of their petition shortly before the scheduled commencement of a state court action against Defendants. Neither assertion has any merit.

Defendants filed their joint voluntary petition under Chapter 7 on May 5, 2011. The Court's review of the main case docket reveals absolutely no record of any party challenging the eligibility of Defendants to file a Chapter 7 bankruptcy case, or their good faith in filing bankruptcy. In addition, although Plaintiff alleges (and alleged during the trial in this matter) that Defendants/Debtors filing of their petition one day prior to the scheduled commencement of a state court action is evidence of their bad faith, or their intent maliciously and willfully to cause him injury, there is no legal support for such an argument, as the Court explained to the Plaintiff, before, and during, the trial. While the Court acknowledges that it may be irritating, or worse, to have a bankruptcy filing upend a scheduled trial in state court, there is simply nothing in the Code or in the cases interpreting the Code establishing that it is "bad faith" or "illicit" conduct per se for a debtor to file a bankruptcy case, and invoke the automatic stay of Section 362(a), even immediately prior to the commencement of a trial in state court. Plaintiff's arguments on this score are meritless.

      B.    Plaintiff's Complaints About the Conduct of the Trial.

Plaintiff asserts a number of complaints about the Court's conduct of the trial.

Case: 11-04254    Doc# 44    Filed: 07/30/12    Entered: 07/30/12 16:56:48    Page 7 of 16

First, Plaintiff complains that he was given too short a period of time to present his case. Although the Court appreciates that many parties may feel, after the conclusion of a trial, that they would have benefitted from additional time to present their evidence, the Court cannot agree that the Plaintiff was not given an adequate opportunity to present his case.

Initially, the Court notes that the Amended Scheduling Order dated October 23, 2011, six months prior to the trial date, set this matter for a one day trial. Neither party requested, at any time prior to or during the trial, that the Court enlarge the time allotted for trial. Moreover, at the commencement of the trial, the Court noted that, although a "fifty/fifty" division of the time available during a one day trial would have allowed each side three and a half hours to present their case or defense, in light of the fact that the Plaintiff had the burden of proof, it might be reasonable to allocate four hours to Plaintiff and three hours to the Defendants. The Defendants agreed to this arrangement, and Plaintiff was thereby effectively given additional time to present his case. And, at the conclusion of the Defendants' case, the Plaintiff was given even more time to interrogate Michael McKean further. In light of all of these facts, Plaintiff's complaints about the time allotted to him to try his case ring hollow.

Moreover, the Court held a Pretrial Conference in this matter on March 30, 2012, during which the Court spent more than an hour going over with both parties the conduct of a trial, the elements of the claims and defenses each party had raised, the difficulties

that parties typically encounter in proving the allegations and defenses asserted, as well as certain issues apparent to the Court from review of the trial briefs and the witness and exhibit lists. In particular, the Court spent a significant period of time discussing with Plaintiff the ways in which he might consider prioritizing the matters he wished to present and streamlining the manner in which he might proceed during trial. That Plaintiff chose ultimately to ignore the Court's admonitions, as is painfully evident from a review of the Transcript of the trial, is distressing, but it provides Plaintiff with no cause for complaint.

Plaintiff also complains that the Court "prevented" him from presenting his case by not permitting Plaintiff to challenge matters set forth in the Defendants' trial brief. This assertion is simply incorrect, and, ultimately, irrelevant in any case. When Plaintiff commenced his "case-in-chief" by calling Defendant Michael McKean as a witness and attempting to question him about matters set forth in his trial brief, the Court did remind Plaintiff that he had the burden of proof, and needed to present his affirmative case, and not merely rely on what he believed to be misstatements in Defendants' trial brief, in order to prevail. That Plaintiff momentarily "switched gears" away from Defendant's trial brief in response to the Court's admonition is hardly prejudicial.

And, in the end, it mattered little. As review of the Transcript reveals, and as Defendants noted during the trial, Plaintiff never did present a "case-in-chief" in the traditional

sense of presenting to the Court, via witness testimony (including his own testimony) or documents, a narrative description of what occurred between the parties, and establishing the elements of his claims. Indeed, with the exception of relatively brief testimony from Dr. Jervis about a borrowing transaction allegedly proposed by Defendant Michael McKean to the witness, and testimony from Mark Gigliotti about credit and borrowing issues, neither of which had much, if any, relevance to the matters at hand, Plaintiff's affirmative case consisted exclusively of interrogating, and frequently, haranguing the Defendants about matters concerning which, for the most part, the parties simply had directly conflicting positions, without any basis for the Court to determine that Plaintiff's version of events was any more credible than Defendants'.

Indeed, the Court was forced to resort to cobbling together Plaintiff's "story" from the questions asked by Plaintiff of the Defendants. That Plaintiff's choice of how to "present" his case hampered his ability to convince the Court that he had carried his burden is hardly surprising, or an unfair result for Plaintiff.

Plaintiff also complains that the Court "supported perjury" by Defendant Michael McKean by asking McKean whether he personally witnessed a third party's (Diane Holmgren) signature of a document the authenticity of which Plaintiff challenged. The Court believed that, in light of Plaintiff's challenge to the authenticity of the document, it was important for the Court to determine, and certainly within the Court's power to ask, whether Defendant had

witnessed the signature. That Plaintiff did not believe Defendant's answer was truthful does not render the Court's question inappropriate; and certainly, Plaintiff retained the ability to cross-examine the witness concerning his assertion that he witnessed the signature.

On a more substantive note, Plaintiff complains that the Court failed to acknowledge that, even though the Plaintiff was the record title holder to the Tunbridge Property, he was constrained from protecting his interests therein by evicting the Defendants and selling the property either to recoup moneys he had provided to Defendants, or simply realizing a profit on the transaction (while presumably retaining claims against Defendants for money had and received) by some agreement or arrangement between the Plaintiff and the Defendants.

First, Plaintiff alleges that there was some oral agreement between himself and the Defendants that he would do nothing to exercise control over the Tunbridge Property for a period of forty-five days while the Defendants arranged a "refinance". There is simply no evidence, written or oral, other than Plaintiff's bald assertion, of such an agreement restricting his rights respecting the Tunbridge Property. More troubling, this current assertion runs directly contrary to Plaintiff's statements to the Court during the trial, in response to the Court questioning what, if anything, prevented Plaintiff, as the record owner of the Tunbridge Property, from protecting himself by simply selling the property at a time when the property presumably had substantial equity, given

11

that there was no restriction, other than his own sense of what would be "moral," on his abilities to protect his interests.

Second, Plaintiff now attempts to rely upon the language in Exhibit 14 as providing evidence of such an arrangement or agreement. Exhibit 14 is a one page document prepared by attorneys for Diane Holmgren, the previous owner of the Tunbridge Property, and the transferor of the property to Plaintiff, concerning Holmgren's prior arrangement with the Defendants and her motivation in selling the Tunbridge Property to Plaintiff. The testimony at trial was that the primary motivation for preparing Exhibit 14 was Holmgren's counsel's concern that the transfer of the Tunbridge Property to Plaintiff, at less than the current market value, not be deemed a "gift" by Holmgren, or otherwise give rise to a taxable event for her. Neither the language of the document, nor any testimony pertaining thereto, supports Plaintiff's argument that there was some binding arrangement between himself and the Defendants that prevented him from protecting his interests in the Tunbridge Property.

Lastly, the Court wishes to address statements in Plaintiff's Supp. Brief to the effect that this matter having been determined, and the automatic stay having been terminated, he is free to return to state court to continue litigating the civil case he brought against the Debtors pre-bankruptcy. Plaintiff's view of his ability to pursue that action is severely mistaken.

As an initial matter, this Court has original and exclusive jurisdiction to adjudicate issues of dischargeability under

12

Sections 523(a)(2), (4) and (6), and has jurisdiction also to determine the amount of the claims at issue in such actions. Thus, once the Defendants filed bankruptcy, this was the only Court that could determine whether Defendants' debt to Plaintiff would be excepted from the discharge for the reasons set forth in Plaintiff's Complaint. And, having tried the action in this Court, this Court's determination of the claims decided and the issues presented is binding, but for the effects of any subsequent reversal or modification on appeal. For this reason, Plaintiff may not return to state court to "re-litigate" the issue determined herein.

Moreover, any attempt to pursue the state court action would expose Plaintiff to damages for a willful violation of the discharge injunction of Section 524 of the Code. Plaintiff correctly notes that the automatic stay of Section 362(a) of the Court has terminated in Defendants' case. However, that does not give Plaintiff the ability now to pursue an action against the Defendants. To the contrary, the automatic stay has terminated in Defendant/Debtors' case because they have received their discharge of debts under Section 524. That discharge, when entered, was still subject to the determination of the issues set forth in Plaintiff's timely filed Complaint. Those issues have now been decided, and, with the exception of the $24,900 (plus interest) that the Court has determined is nondischargeable, Defendants' debt to Plaintiff is discharged. Entry of the discharge under Section 524 creates an injunction, preventing any party from collecting a

debt discharged in bankruptcy, and providing for damages in favor of the Debtors for defending against any attempt to collect such a debt.

The Court is quite aware that, on a personal level, this outcome is unsatisfactory to Plaintiff. Repeating an admonition that the Court delivered to both parties at several instances before, during and after the trial on this matter, all that this Court can do in litigation is determine whether a party has proven a case under the applicable statute, and case-law. Whether that outcome is satisfying or not, it is definitive, save for the parties' right to appeal this Court's decision.

Judgment will be entered in favor of the Plaintiff for: $315,641.49. Of this amount, the portion deemed to be nondischargeable, i.e., $24,900, accrued interest at a rate of ten percent per annum prior to the commencement of the case. Ordinarily, the judgment entered by a federal court, including here in a nondischargeability action, accrues interest at the federal rate set forth in 28 U.S.C. 1961. *Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 871 (9th. Cir. 2001). However, governing case law also establishes that a court may impose a state-law rate where the equities so dictate. *Id.* The Court concludes that the equities require the imposition of the higher California state rate of interest in this case, if for no other reason than that the amount subject to this rate, $24,900, is determined to be nondischargeable and, in light of the Trustee's Report of No Distribution, there was absolutely no possibility of

14

Case: 11-04254    Doc# 44    Filed: 07/30/12    Entered: 07/30/12 16:56:48    Page 14 of 16

Plaintiff obtaining any distribution from this estate. Therefore, the nondischargeable amount will accrue interest at a rate of $6.82 per diem from May 21, 2009 to the date of payment.

Date: July 30, 2012

_____
The Honorable William J. Lafferty

END OF DOCUMENT

15

COURT SERVICE LIST

Mitch House
154 Crest Avenue
Alamo, CA 94507

Michael C. McKean
1755 3rd St.
Livermore, CA 94550

Blanca L. McKean
1755 3rd St.
Livermore, CA 94550

16